

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. PD-0202-08

### THE STATE OF TEXAS

### v.

### MILTON DWAYNE GOBERT, Appellee

### ON APPELLEE'S PETITION FOR DISCRETIONARY REVIEW FROM THE THIRD COURT OF APPEALS TRAVIS COUNTY

PRICE, J., delivered the opinion of the Court in which MEYERS, WOMACK, JOHNSON, KEASLER, HERVEY, HOLCOMB and COCHRAN, JJ., joined. KELLER, P.J., concurred in the result.

### O P I N I O N

During a custodial interrogation, right after his *Miranda* rights were read to him,[1] the appellee made a statement that referenced his right to a "lawyer." The police detectives continued the interrogation without providing counsel. We granted the appellee's petition for discretionary review in order to determine whether the continued interrogation, resulting

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

in a confession, violated the appellee's Fifth Amendment right to the presence of counsel during custodial interrogation. We hold that it did.

## FACTS AND PROCEDURAL POSTURE

The Austin Court of Appeals recited the facts as follows:

> The relevant facts are not in dispute. Gobert, who was suspected of committing the murder for which he now stands indicted, was arrested for a parole violation and for the assault of a woman named Christine or Christina. Following his arrest, Gobert was questioned by Austin detectives Burgh and Scanlon. Burgh began the interview by advising Gobert of his constitutional and statutory rights. *See Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2nd, 694 (1966); Tex Code Crim. Proc. Ann. Art. 38.22, §§ 2, 3 (West 2005). Asked if he understood his rights, Gobert replied that he did and then said, "I don't want to give up any right, though, if I don't got no lawyer." Scanlon immediately asked, "You don't want to talk?" The question was repeated by Burgh, "You don't want to talk to us?" Gobert answered, "I mean, I'll talk to y'all. I mean, I know, you know, what she had said about it, you know. I'll speak with y'all, but (inaudible), man. I mean, I'll speak with y'all, you know." Scanlon then said, "Okay, signing this – signing this is not giving up your right. Signing this is acknowledging that this was read to you." He then added, "Okay? Your choice to talk to us is different. This – all this is, is acknowledging that you were warned."
>
> Burgh then began to question Gobert regarding his relationship with Christina. After a number of questions were asked and answered, Scanlon interrupted to ask, "I want to clear something up, though, because earlier you said you don't want to give up your right to a lawyer. I want you – I want you – I want to clear up the fact that you want to talk to us about this. Okay? You understand what I'm saying?" Gobert answered, "Yeah." Scanlon continued, "I want to clear it up. I mean, that's – that's what you want to do, right?" Gobert again answered, "Yeah." The interrogation continued for several hours and ultimately resulted in appellant confessing to the murder of Mei Kernena Cotton.[2]

---

[2]

*Gobert v. State*, 228 S.W.2d 221, 223 (Tex. App.—Austin 2007) (*Gobert I*); *Gobert v. State*, 244 S.W.3d 861, 863 (Tex. App.—Austin 2008) (*Gobert II*).

The trial court ruled that the appellee's statement constituted an unequivocal invocation of his Fifth Amendment right to counsel during any ensuing interrogation, and therefore suppressed the appellee's confession. Upon the State's interlocutory appeal, the court of appeals at first affirmed the trial court's judgment after conducting a *de novo* review.[3] The State filed a motion for rehearing, which the court of appeals denied. The State then filed a petition for discretionary review. Pursuant to Rule 50 of the Texas Rules of Appellate Procedure, the court of appeals withdrew its original opinion and substituted a modified one.[4] This time the court of appeals held that the appellee's statement was not unequivocal, and that the detectives therefore did not violate his Fifth Amendment right to counsel by continuing to question him.[5] We granted the appellee's subsequent petition for discretionary review in order to examine this revised holding.[6]

## FACTUAL DISPUTE?

During the pre-trial suppression hearings, the State introduced three DVDs containing an audio/visual recording of the appellee's interrogation, plus a transcription it had prepared. The purported invocation of counsel was transcribed exactly as the court of appeals reported

---

[3] *Gobert I, supra.*

[4] TEX. R. APP. P. 50.

[5] *Gobert II, supra.*

[6] TEX. R. APP. P. 66.3(c).

it, *viz*: "I don't want to give up any right, though, if I don't got no lawyer." The trial court watched the DVD recordings and reviewed the transcript. In ruling that the confession was inadmissible, the trial court observed: "I just don't find anything that is unequivocal about the statement 'I'm not going to waive any rights if I don't got no lawyer.' I mean, I think that that's as unequivocal as I can imagine a statement being." Later, the trial court observed:

> You know, there is a lot of things that [the appellee] says on the tape that I couldn't understand and that he talks so low and mumbles and that sort of thing. But one is very clear. When he gets particularly to this point, he says out loud and pretty loudly, he says, 'I don't want to give up any right though, if I don't got no lawyer.' He tells – that is the loudest thing he says throughout the interview.

In its brief on direct appeal, it is this statement, taken from its own transcript of the interrogation, that the State argues was equivocal. The court of appeals originally found this fact to be undisputed—as, indeed, at that point, it was.

In its motion for rehearing following the court of appeals's initial opinion, however, the State took issue with the content of the appellee's statement for the first time. "Listening closely to the videotape," the State asserted, "reveals that parts of this comment are close to being inaudible."[7] When the court of appeals denied the motion for rehearing, the State argued in its petition for discretionary review that the best transcription that can be made of the actual words spoken by the appellee at this critical juncture in the recording is: "I don't

---

[7] State's Motion for Rehearing, at 5.

want to give up those rights, though, ___ ___ ___ ___ got no lawyer."[8] The State also pointed to the fact that the defense had commented during the suppression proceedings that "some corrections" to the transcript might be warranted, and, for the first time, the State agreed.[9] The State argued that the court of appeals had erred to rely solely on the written transcript in identifying the relevant facts, especially in view of the fact that the DVD recordings were also in evidence which, in the State's estimation, demonstrate "that the [appellee's] statement was mumbled, unintelligible, and ambiguous."[10] In issuing its Rule 50 opinion, however, the court of appeals persisted in describing the facts as "undisputed."[11]

The State also argued its new interpretation of the facts during oral argument before this Court. We decline, however, to adopt it. First, up until the time the State filed its motion for rehearing in the court of appeals, both parties assumed that the appellant's statement had been as the court of appeals has described it. The State challenged the accuracy of its own

---

[8] State's Petition for Discretionary Review, at 2.

[9] *Id*. The defense suggested no specific corrections, however, and neither did the State endorse the need to correct its own transcription during proceedings in the trial court, much less did it ever suggest that its own particular transcription of the statement at issue was, in any respect, inaccurate. For the first time in its PDR, the State argued: "It is difficult to discern parts of this 'invocation,' but it is clear that the transcript does not paint the complete picture. According to the State's [new] understanding of the video, [the appellee] said 'these rights,' rather than 'any right.' Second, the State does not understand [the appellee] as saying the phrase 'if I don't got.' He might have said 'before I got,' or possibly something else, but most likely not 'if I don't got . . .'" *Id*. at 2-3.

[10] *Id*. at 3.

[11] *Gobert II*, *supra*, at 863.

transcript only after it lost the argument based on that version of the appellant's statement on original submission. The court of appeals is not required to entertain a new argument from an appellant (here, the State) for the first time on rehearing, and when it refuses to exercise its discretion to do so, it renders no decision on that new argument that is available for discretionary review.[12] Second, the trial judge viewed the DVD with the State's transcript in hand, and he found that the appellee did in fact actually declare, "I don't want to give up any right though, if I don't got no lawyer." The record supports that conclusion, even as it might also support a different conclusion. Therefore, we will not second-guess the trial court's determination of the facts,[13] especially at this stage of the proceedings.

---

[12]

   *Rochelle v. State*, 791 S.W.2d 121, 124-25 (Tex. Crim. App. 1990). Because the State did not prevail in the trial court, it cannot take advantage of our recently announced rule that "[a]n appellee's failure to make a particular argument [on appeal] is a factor that may be considered when this Court decides whether to exercise its discretion to grant [discretionary] review, but it does not bar this Court from granting review to address the issue if the Court, in its discretion, decides that review is warranted." *Volosen v. State*, 227 S.W.3d 77, 80 (Tex. Crim. App. 2007). *See also Rhodes v. State*, 240 S.W.3d 882, 887, n.9 (Tex. Crim. App. 2007) ("the party who loses at the trial level who then complains about a decision of the court of appeals must address both the holding and reasoning of the court of appeals, but the party who wins at the trial level who complains about a decision of the court of appeals need only address the holding of the court of appeals."). The reasoning of the court of appeals in this case was based upon an understanding of the applicable facts that was, indeed, undisputed. The State, as appellant, should not be heard now to challenge that reasoning based upon a new, unilateral understanding of the applicable facts that was not timely presented to, and never considered by (nor required to be considered by), the court of appeals.

[13]

   The State cites *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000), for the proposition that appellate deference was inappropriate because audio/video evidence indisputably belied testimony that was the only evidence in the record that supported a particular finding of historical fact made by the trial court. But the DVD in this case does not indisputably refute the trial court's finding that what the appellant said was, indeed, what the State's own transcript showed it to be. Under these circumstances, it is appropriate that we defer to the trial court's primary fact-finding function. *Montanez v. State*, 195 S.W.3d 101, 108-09 (Tex. Crim. App. 2006).

**THE LAW**

Unlike the Sixth Amendment right to counsel, which is offense-specific, the Fifth Amendment right to have an attorney present during police interrogation applies to any offense about which the police might wish to question a suspect.[14] Among the rights about which the police must advise a suspect whom they have arrested is the right to have counsel present during any police-initiated interrogation.[15] Once the suspect has invoked his Fifth Amendment right to counsel, police interrogation must cease until counsel has been provided or the suspect himself reinitiates a dialogue.[16]

Not every mention of a lawyer will suffice, of course, to invoke the Fifth Amendment right to the presence of counsel during questioning.[17] An ambiguous or equivocal statement with respect to counsel does not even require officers to seek clarification, much less halt their interrogation.[18] Whether the mention of a lawyer constitutes a clear invocation of the right to counsel will depend upon the statement itself and the totality of the surrounding

---

[14] *McNeil v. Wisconsin*, 501 U.S. 171 (1991).

[15] *Miranda v. Arizona*, *supra*, at 479.

[16] *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

[17] *E.g.*, *Dinkins v. State*, 894 S.W.2d 330, 351 (Tex. Crim. App. 1995) ("the mere mention of the word 'attorney' or 'lawyer' without more, does not automatically invoke the right to counsel.").

[18] *Davis v. United States*, 512 U.S. 452, 461-62 (1994).

circumstances.[19] The test is an objective one, *viz*: the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[20] We look to the totality of circumstances to determine whether any statement referencing counsel was really a clear invocation of the Fifth Amendment right; we do *not* look to the totality of the circumstances, however, to determine in retrospect whether the suspect really *meant* it when he unequivocally invoked his right to counsel.[21] Finally, when a suspect makes a clear, but limited, invocation of the right to counsel, the police must honor the limits that are thereby placed upon the interrogation, but they may question their suspect outside the presence of counsel to the extent that his clearly expressed limitations permit.[22]

## APPLICATION OF THE LAW TO THE FACTS

The court of appeals believed that "it is clear that [the appellee's] statement is not an unequivocal request for counsel."[23] We agree that the appellee did not make a direct and

---

[19]

*Id*. at 459.

[20]

*Id*. at 458-59.

[21]

*See Smith v. Illinois*, 469 U.S. 91, 100 (1984) ("under the clear logical force of settled precedent, an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself.").

[22]

*Connecticut v. Barrett*, 479 U.S. 523, 529 (1987).

[23]

*Gobert II*, *supra*, at 864.

straightforward request for a lawyer. But that does not necessarily mean that he did not adequately communicate his desire to deal with his police interrogators only through, or at least in the presence of, counsel. Here, we think the appellee made that desire abundantly clear.

Immediately following the administration of his *Miranda* rights, upon being asked whether he understood them, the appellee unequivocally stated that he did not want to "give up any right" in the absence of a lawyer.[24] Under the circumstances, we may safely assume he meant "any" of the rights that had just been read to him, and that the lawyer he referred to was the counsel to which the officers had just informed him he was legally entitled. Among the rights the appellee had just been informed of, and which he did not wish to "give up" in the absence of counsel, was the right to silence. We therefore construe the appellee's phrase to be an indirect expression of a possible willingness to waive, *inter alia*, his right to silence, but only on the unqualified condition that he first be afforded his right to have counsel present.

Just because a statement is conditional does not mean it is equivocal, ambiguous, or otherwise unclear. The only aspect of the appellee's statement that was tentative was

---

[24] Common experience counsels that, in the context of this particular dialogue with the police, the appellee's use of the double negative should be disregarded. We reasonably construe the appellee's phrase, "if I don't got no lawyer," to be functionally equivalent to the phrase in standard English, "if I don't have a lawyer," or "unless I have a lawyer." In context, it is clear enough (and would have been clear to the interrogating officers) that the appellee meant that he did not desire to "give up any right" in the absence of the lawyer the police had just informed him he was entitled to.

whether he would in fact be willing to "give up" any of his *Miranda* rights. What was absolutely crystal clear about his statement was that he did not desire to do so (or to be pressured by the police to do so) in the absence of counsel. It was more than sufficient to alert the interrogating officers that *if* they desired to speak with the appellee further, in an attempt to persuade him to waive any of the *other* rights that *Miranda* confers upon him, then they must first afford him the right to have counsel present during that attempt.[25] Before they could take advantage of the appellee's apparent amenability to talk, and thereby forego his constitutional right to stand mute, the interrogating officers were obliged to abide by his clearly stated condition.

This case is inversely analogous to *Connecticut v. Barrett*.[26] There the suspect clearly indicated to the police that he was willing to talk to them, but just as unequivocally refused to give them a written statement without counsel being present.[27] The Connecticut Supreme Court construed his refusal broadly as an invocation of the right to counsel for all purposes,

---

[25] It is telling that Officer Scanlon did in fact recognize that the appellee had requested to deal with the police only through counsel ("I want to clear something up, though, because earlier you said you don't want to give up your right to a lawyer"), but that rather than attempt to verify any invocation of *that* right, he proceeded directly to persuade the appellee to give up his right to silence ("I want you – I want you – I want to clear up the fact that you want to talk to us about this").

[26] 479 U.S. 523.

[27] *Id*. at 525-26.

including oral interrogation.[28]  The United States Supreme Court reversed, holding that the suspect had clearly communicated only a *limited* desire for counsel, and that the interrogating officers had honored that limitation.[29]  The Court remarked: "To conclude that respondent invoked his right to counsel for all purposes requires not a broad interpretation of an ambiguous statement, but a disregard of the ordinary meaning of respondent's statement."[30] Similarly, to construe the appellee's statement here as equivocal with respect to the invocation of his right to counsel is to ignore the manifest clarity of his condition, as expressed by the ordinary meaning of his words.  For while the appellee initially expressed what the police might reasonably have taken to be a tentative willingness to waive his right to silence and talk to them ("I don't want to give up any right, though, *if* . . ."), any such willingness was forthrightly predicated upon the firm and unqualified condition (". . . I don't got no lawyer") that they first provide him the assistance of the attorney to which they had just told him the Fifth Amendment entitled him.  In failing to honor the appellee's unambiguous and unqualified condition, and instead continuing to interrogate him in an effort to persuade him to talk to them, the officers violated his right to counsel.

The court of appeals went on to observe that "immediately after making the statement

---

[28] *Id*. at 526-27.

[29] *Id*. at 529-30.

[30] *Id*.

in question, [the appellee] told the police three times that he was willing to talk to the police, indicating that he was willing to proceed without having the assistance of counsel."[31] Such post-request statements, however, "may not be used to cast retrospective doubt on the clarity of the initial request itself."[32] Because we have concluded that the appellee's condition that counsel be present before he would talk to the police was unequivocal, we discount the court of appeals's observation as immaterial to the analysis. Once a suspect has clearly invoked his right to counsel, no subsequent exchange with the police (unless the suspect has initiated it himself) can serve to undermine the clarity of the invocation.

## CONCLUSION

We reverse the judgment of the court of appeals and reinstate the order of the trial court granting the appellee's motion to suppress. The cause is remanded to the trial court for further proceedings consistent with this opinion.

Delivered:    January 28, 2009
Publish

---

[31] *Gobert II*, *supra*, at 865.

[32] *Smith v. Illinois*, *supra*, at 100.